**PHELAN v. PARSONS et al. SAME v. MURPHY, GORMAN & WATERHOUSE, Inc. (two cases). In re MURPHY, GORMAN & WATERHOUSE, Inc.**

Circuit Court of Appeals, First Circuit. December 2, 1927.

Rehearing Denied January 18, 1928.

Nos. 2159, 2164, 2173.

1. **Bankruptcy ⬅375—On acceptance of composition, referee should suspend further proceedings pending determination of question of confirmation.**

After composition has been accepted by creditors, referee should suspend further proceedings until question of confirmation has been determined by judge.

2. **Bankruptcy ⬅375—Before confirmation of composition creditors have no interest in allowance or disallowance of claims.**

Pending confirmation of a composition, creditors ordinarily have no interest in allowance or disallowance of claims of others.

3. **Bankruptcy ⬅375—Object of composition is to get going business back into hands of business managers.**

A leading object of composition is to get a going business back into control of business managers, and speed is important.

4. **Bankruptcy ⬅375—Pending composition proceedings, trustee cannot contest claims at expense of estate.**

Pending composition proceedings, after adjudication, trustee has no standing to contest claims at expense of estate.

5. **Bankruptcy ⬅340(4)—Claimant held entitled to allowance of his claim for money lent to bankrupt.**

Claimant *held*, on the evidence, to have lent money to bankrupt corporation to take up its note at a bank, and not personally to its treasurer, and entitled to allowance of his claim against the bankrupt estate.

Johnson, Circuit Judge, dissenting.

Appeals from the District Court of the United States for the District of Massachusetts; James Arnold Lowell, Judge.

In the matter of Murphy, Gorman & Waterhouse, Inc., bankrupt; Starr Parsons and others, trustees. From decrees disallowing his claim as a creditor, confirming a composition, and from an order permitting bankrupt to intervene, James P. Phelan brings separate appeals. Reversed and remanded on first two appeals, and third appeal dismissed.

Edward J. Flynn, of Boston, Mass. (John V. Phelan, of Lynn, Mass., and Augustus L. Baker, of Boston, Mass., on the brief), for appellant.

Lee M. Friedman, of Boston, Mass. (Friedman, Atherton, King & Turner, of Boston, Mass., on the brief), for trustees.

Alexander G. Gould, of Boston, Mass., for bankrupt.

Before BINGHAM, JOHNSON, and ANDERSON, Circuit Judges.

ANDERSON, Circuit Judge. These three appeals grow out of a controversy over a claim of James P. Phelan against the bankrupt estate of Murphy, Gorman & Waterhouse, Inc. No. 2159 is an appeal from a final decree disallowing Phelan's claim. This record contains a summary of the evidence before the referee, which the bankrupt, by motion to diminish, seeks to have eliminated.

No. 2164 is Phelan's appeal from a confirmation of a composition. As his objections were overruled on the sole ground that he was not a creditor, there is before us no evidence to sustain his objections, even if in this court he be held a creditor.

No. 2173 is Phelan's appeal from an order permitting the bankrupt to intervene in No. 2159, made after appeal taken and citation served on the trustees as the only appellees.

The proceedings were inexcusably irregular and involved. The records omit parts necessary for the clear presentation of some of the questions raised, but contain much repetition and surplusage. Wasting delay and needless and futile litigation have accrued from disregard of well-settled principles, perfectly familiar to at least some of the experienced and learned counsel in this case.

On an involuntary petition filed on December 13, 1926, Murphy, Gorman & Waterhouse, Inc., was, on January 10, 1927, adjudicated a bankrupt, and the case then sent to the referee. On January 19, Phelan filed

a claim for $35,000, grounded on a promissory note of the bankrupt dated November 22, 1926. Two days later counsel for various creditors objected to the allowance of this claim. The first meeting of creditors was held on or about January 21; trustees were then elected; the bankrupt made an offer in composition of 40 per cent. In Phelan's petition for a review, filed March 9, 1927, it is stated that this offer of composition was, at a meeting held on February 18, accepted by a majority in number and amount of the creditors. For present purposes and on this inadequate record, we are warranted in assuming that statement to be correct. It also appears that Phelan was recorded as one of the assenting creditors; the referee reports that he permitted him to vote for trustees and in favor of the composition. Cf. Nassau Works v. Brightwood Co., 265 U. S. 269, 274, 44 S. Ct. 506, 68 L. Ed. 1013.

Apparently at the instance of counsel representing creditors and the trustees, the referee proceeded, on February 28, to try the question of the validity of Phelan's claim. There is nothing to indicate that the bankrupt then desired such trial. Phelan objected on the ground that, pending confirmation or rejection of the offer of composition, the referee's jurisdiction was limited to matters necessarily involved in the composition.

After a trial conducted by counsel for Phelan and counsel for the trustees, the referee disallowed Phelan's claim, on the ground that his debtor was not the bankrupt, but Murphy, its defaulting treasurer. The referee's decision against Phelan is dated April 1, 1927. Phelan's petition for review, filed on April 11, reasserts his objection to the referee's jurisdiction, and challenges broadly his conclusion from the evidence.

Before filing, on May 1st, a certificate on this petition, the referee, having held that Phelan was not a creditor, recommended confirmation of the composition, stating that the requisite money therefor ($163,944.61) had been duly deposited in bank, where presumably it still lies. These records contain no schedule of creditors, of claims allowed, or complete list of assenting creditors, or even the amount of the claims of such assenting creditors.

On April 25 Phelan filed with the referee objections to the confirmation of the composition, raising issues under section 12d of the act. On May 19 the referee overruled these objections on the single ground that Phelan was not a creditor. On May 23 the court confirmed the composition. On June 22 Phelan claimed an appeal from the order

of confirmation, with 22 assignments of error; No. 2164.

In No. 2159, on June 8 Phelan's petition for appeal from a final decree of the court affirming the referee's disallowance of his claim was allowed and citation issued, on which service was accepted on June 14 by counsel for the trustees. No citation was addressed to or served upon the bankrupt or any creditors. A summary of the evidence before the referee was agreed upon by counsel for Phelan and counsel for the trustees, and was approved by the court and filed on July 7. On July 25, the bankrupt filed a petition for leave to intervene, allowed on the same day. From this order Phelan claimed, on August 10, an appeal, allowed on August 16, and filed 20 assignments of error. This is No. 2173. In this court the bankrupt, apparently convinced that the District Court had no power to allow this intervention after citation issued and served, has filed, in No. 2159, a petition for leave to intervene, which is here contested by Phelan. In Nos. 2164 and 2173 a creditor and the trustees have filed in this court a petition for leave to intervene. The bankrupt has also filed in this court in No. 2159 a petition to diminish the record, practically a repetition of a cross-præcipe filed and allowed in the District Court in No. 2164, to the effect that the summary of evidence agreed upon between counsel for the trustees and counsel for Phelan at the hearing on the disallowance of Phelan's claim should be struck out.

This partial outline of this confusing record is enough to ground certain conclusions: [1] After the offer of composition had been filed and accepted by the requisite majority of creditors, the referee should not have proceeded to a hearing as between Phelan and the trustees, or Phelan and other alleged creditors, as to the validity of Phelan's claim. It is well settled that composition is, in important aspects, a trade between the bankrupt and his creditors, in a measure superseding regular bankruptcy proceedings. Cumberland Glass Co. v. De Witt, 237 U. S. 447, 35 S. Ct. 636, 59 L. Ed. 1042; Nassau Works v. Brightwood Co., 265 U. S. 269, 44 S. Ct. 506, 68 L. Ed. 1013; (C. C. A.) 286 F. 72, and cases cited.

After an offer accepted by the requisite number and amount of creditors, ordinary bankruptcy proceedings should be suspended by the referee pending determination of confirmation of the offer by the judge. Gilbert's Collier on Bankruptcy, p. 286.

[2] It was then the duty of the referee to speed in every legal and practical way the

composition proceedings. Counsel for the trustees had then no standing, at the expense of the estate, to contest the validity of Phelan's claim. Pending confirmation, creditors have no interest in the allowance or disallowance of the claims of others, except possibly for the remote reasons stated by Mr. Justice Brandeis in Nassau Works v. Brightwood Co., 265 U. S. 267, 273, note 5, 44 S. Ct. 506, 68 L. Ed. 1013.

The composition provisions of the act would be found generally futile and unworkable, if the procedure adopted in this case should become the usual practice. In composition, speed is even more essential than in regular bankruptcy, in which speed and equality are said to be the two outstanding ideals—like most ideals, rarely achieved. 11 USCA p. 17, note 42, and cases cited.

[3] A leading object of composition is to get a going business (while it is going) out of the clutches of the law into the control of business managers, who hope, through it, to derive profits from the conduct of a useful industry. "Interruption incident to delay necessarily impairs the value of a business as a going concern." 265 U. S. 272, 44 S. Ct. 506, 68 L. Ed. 1013. Cf. the amendment of 1910 (36 Stat. 838), under which composition may be offered before adjudication, a speeding arrangement availed of in the large majority of composition cases. Nassau Works v. Brightwood Co. (C. C. A.) 286 F. 72, 75.

[4] Where, as in this case, a composition offer comes after adjudication, it would be intolerable to permit trustees, at the expense of the estate, to promote or to conduct litigation, not a natural or necessary incident of the pending composition proceedings, which prevents the estate from revesting in the bankrupt, and the dismissal of the proceedings.

It is also clear that, after Phelan's appeal had been allowed and citation served on the trustees, the District Court had no jurisdiction to entertain the bankrupt's petition to intervene. Midland Terminal R. Co. v. Warrinner (C. C. A.) 294 F. 185, 188; Parker v. N. E. Oil Co. (D. C.) 15 F.(2d) 236, 238, and cases cited. But the bankrupt's petition to be allowed to intervene in this court is allowed. As already indicated, on the issue of the validity of Phelan's claim, pending confirmation of composition, the bankrupt is the chief, and normally the only proper, opposing party. But we do not intimate that, under the conditions present in this case in February, 1927, the referee should have then set for hearing, even as between the bankrupt and Phelan, the validity of this claim. He should

not; for there is nothing to indicate that such trial at that time was a necessary or appropriate step in dealing with the pending offer of composition. Cf. 265 U. S. 273, note 6, 44 S. Ct. 506, 68 L. Ed. 1013. So far as appears, no creditor or alleged creditor was then objecting to the composition, and the referee should have promptly reported the composition offer to the court.

But for one aspect of the record, we should be compelled to say that the merits of Phelan's claim were not before us. As already indicated, Phelan and the bankrupt were, under the conditions here presented, the only proper parties to that contest. But in this court the bankrupt has now intervened, and alleges that it was represented by counsel and participated in the trial before the referee and at the hearing before the court. It may therefore be said for present purposes to have adopted the action of counsel for the trustees as and for its own action against Phelan's claim. And if the bankrupt can be allowed to claim the benefit of a trial conducted before the referee by counsel for the trustees, it must also accept the record of that trial, agreed upon by counsel for Phelan and counsel for the trustees. The bankrupt's motion for diminution of the record is therefore denied.

[5] As there was a fairly full trial of Phelan's claim on its merits, it is plainly in the interest of the parties that that issue be now determined. To send it back for a new trial because of the improper procedure, above outlined, might probably still further delay a settlement already, and unjustifiably, too long delayed. Partly, therefore, on practical grounds, we conclude that it is the duty of this court to consider that claim on its merits.

Phelan was formerly a shoe manufacturer in Lynn. On his retirement in 1919, three of his former associates or employees—Murphy, Gorman, and Waterhouse—formed the bankrupt corporation and took over the business. Phelan loaned each $5,000 to start them in the business. Murphy was the treasurer of the corporation. Phelan had implicit confidence in Murphy's honesty. He had, when absent in Europe, left Murphy in charge of securities, large sums of money, and papers, and a power of attorney signed by Phelan in blank. Murphy testified to the effect that he knew of and valued Phelan's confidence in him. Business under the new management was apparently profitable, with an output approaching $1,000,000 a year. Murphy, however, misapplied over $100,000 of his corporation's money. Some of it was apparently loaned to one or two newspaper

enterprises. The details of the causes of his downfall and embezzlement are not disclosed. But it is undisputed that he was a wrongdoer to the extent of over $100,000, and that this embezzlement was the main, if not the only cause of the bankrupt's insolvency.

As a result of this misapplication, a substantial part of the bankrupt's loans from the Atlantic National Bank were, in November, 1926, overdue; the bank was pressing Murphy for payment. It is unquestioned that on November 22, 1926, Murphy asked Phelan to meet him at the company's place of business, and that he then obtained from him a check for $5,000 and bonds of the face value of $30,000, which were shortly thereafter taken by Murphy to the Atlantic Bank, and there used to pay off three notes of the bankrupt, aggregating $32,500—a two-months note for $10,000, dated August 17; a note, for $12,500, dated August 19, 1926, payable 75 days from date; and a note for $10,000, dated September 7, payable on November 2. These three notes were all paid, with the accrued interest or discount, on November 27, and a little later turned over to Phelan. Undeniably Phelan's money and bonds reduced the bankrupt's indebtedness to the Atlantic Bank by at least $32,500. The equities of the case require that Phelan be at least remitted to the bank's rights under these notes. But we do not put our conclusion on that ground.

As stated in effect by the referee, the gist of the case is whether Phelan made his loan to the bankrupt, or to Murphy, the defaulting treasurer. The referee states this issue baldly: "If the testimony of Phelan was accepted, the loans and advances were made by him directly to the corporation, and his claim is a corporation indebtedness."

The referee goes on to discuss, though rather briefly, the evidence, reaching this conclusion: "I believe Murphy's, rather than Phelan's, version of the transaction, and have disallowed the claim."

The question for this court is whether this conclusion of the referee was plainly wrong, or "manifestly against the weight of the evidence." In re Noyes Bros. (C. C. A.) 127 F. 286, 287; Page v. Rogers, 211 U. S. 575, 577, 29 S. Ct. 159, 53 L. Ed. 332.

The referee's conclusion acquires no substantial additional weight from its affirmation by the District Court. It was stated in argument that the court affirmed the referee's decision in the absence of Phelan's regular counsel, who expected to argue the case, but was absent in New York, and sent an unprepared junior to ask for a continuance, which was not granted. Under these circumstances the decision of the court below must be regarded as scarcely more than pro forma.

We do not overlook that, in weighing evidence involving to some degree a question of credibility, weight attaches to the decision of the tribunal that sees the witnesses and reaches a determination in part grounded on their appearance. Nevertheless it is the duty of this court, sitting as a court of equity, to weigh the evidence in the light of all the surrounding circumstances, as well as in the light of the conflicting testimony of the two witnesses.

The issue is whether Phelan made his advances to help out the corporation, which had succeeded to his business and in which he was indirectly, by his loans to the three owners, then interested, or made personal advances to Murphy to help him out of trouble because of his embezzlement of his concern's funds, then and there confessed to Phelan. In weighing the evidence of Phelan and Murphy, so far as that evidence is conflicting, we cannot overlook that Phelan is a man of unimpeached integrity and standing, and that Murphy was, on the undisputed facts, guilty of the gravest sort of financial wrongdoing.

Phelan's natural and inherently credible story of the transaction of November 22 is as follows:

"Mr. Murphy said the the Atlantic Bank * * * 'wants some of our indebtedness paid up, and I would like to borrow $35,000 that is coming due shortly.' I said, 'What is the reason you need money?' He said, 'We had a big failure in California for about $40,-000, and I am temporarily short.' I said, 'How is business with you?' And he said, 'Fine.' I said, 'How much business, roughly, are you doing?' He said, 'Eight hundred thousand or nine hundred thousand this year.' I said, 'Are you busy in the factory at this particular time?' and he said, 'Yes, we are driving;' and I said, 'What do you need this particular money for?' 'Well,' he said, 'they don't want to renew. They want it paid up. Our balance isn't big enough.' I said, 'How big is your balance?' He said, 'I don't think it will meet two pay rolls and possibly not one.' I asked him—I said, 'How big is your loan up there?' and he said, 'Roughly $100,000.' I said, 'What is your bank balance?' 'Well,' he says, 'it is not 10 per cent. of it.' 'Well,' I said, 'I can readily see the bank cannot be making any money on you.' I said, 'Have you got a financial statement of your business?' He said, 'Yes; I have got one.' He gave it to me, and it was marked on it 'Statement made to the Atlantic National,' as I remember it roughly.

"Mr. Phelan then testified that he did not

have that statement; that roughly the figures showed that there was about $2 to pay $1 with, which he (Phelan) considered a healthy condition; that they showed their capital to be $75,000, as it always was, or as he thought it always was, and a surplus of something over $100,000, giving them a net worth of about $170,000 to $180,000; that these figures were 'round,' and he could not remember them; that he told Mr. Murphy that the only reason he (Phelan) could see that the bank wanted the indebtedness paid up was because a sufficient balance was not being carried; that Mr. Murphy said, 'That is just it;' that he (Phelan) said to Murphy, 'How about paying this to me?' and Murphy said, 'You know business; if we shut down a month, when we are doing $120,000 or $130,000, and don't do any business, when collections come in, we have $120,000 or $130,000 coming in, and no expenses outside of the office help and superintendent;' that he (Phelan) said, 'Well, I know something about the business.' Those are the facts. No big pay roll. The pay roll might have been $30,000 or $40,000 a month, and I didn't have any thought of it at all. That he (Phelan) then said, 'All right, I guess I can let you have the money, but I haven't the cash;' that Murphy said, 'I don't care what I get;' so he (Murphy) made out a note then for $35,000, and from there they went to his (Phelan's) lock box in the Security Trust, and he (Phelan) gave him a check for $5,000 and what represented $30,000 par value in bonds.

"Mr Phelan here identified the original note, produced in connection with his claim and already in evidence, to wit, the demand note for $35,000 made payable to him, dated November 22, 1926, and signed 'Murphy, Gorman & Waterhouse, Inc., by William H. Murphy, Jr., Treasurer.' Mr. Phelan also produced a check for $5,000 from himself to William H. Murphy, which was admitted in evidence and marked 'Exhibit 1.'

"Mr. Phelan further testified that he had told everything that was said in Mr. Murphy's office at that time, and not a word was said to him by Mr. Murphy about Mr. Murphy's having taken money from Murphy, Gorman & Waterhouse, Inc., for himself, or that he (Murphy) was short with the company.

"Q. 11. You didn't ask any questions about that? A. Why should I? I had absolute faith in him. Why should I ask him if there was anything wrong with the business? I will say that I didn't.

"That he (Phelan) went to the lock box, took out some securities, and gave them to

Mr. Murphy; that the next thing that transpired was that Mr. Murphy rang him up at his house and said that he wanted to see him; that when he saw him (Murphy) the latter showed him a letter from the Atlantic National Bank, which he (Phelan) signed and gave it back to Mr. Murphy.

"This letter was read and admitted in evidence, marked 'Exhibit No. 2,' and reads as follows:

"'Boston, November 22, 1926.

"'Atlantic National Bank, Boston, Mass.—Gentlemen: This is to advise you I have this day delivered to Mr. William H. Murphy, Jr., the following described bonds owned by me, which it is understood he is to pledge to the Atlantic National Bank of Boston for a note of $27,500, dated November 22, 1926, payable in 60 days from date, with interest at 5 per cent. per annum. [And then follows a list of the bonds.]

"'Yours very truly,

"'James P. Phelan.'

"Mr. Phelan testified that he signed the above letter, because Mr. Murphy said that the bank required it; that the bank didn't know who owned the securities, unless he (Phelan) told them; that, when Mr. Murphy came to him with this letter, he (Phelan) asked him, 'What do you want $35,000 for to pay $32,500 with?' and Mr. Murphy replied, 'The bank always requires a margin when they get securities;' that he (Phelan) also asked Murphy, 'What does the bank want this letter for?' and Murphy replied' 'They want to know that I have the right to put this up'"

Phelan also testified that Murphy gave him the $35,000 note of the corporation, dated November 22, 1926, early that morning at the factory. On cross-examination Phelan consistently denied that at any time Murphy asked him to make a personal loan to him, or to give him securities, or confessed to any misappropriation of the corporation's funds, or other wrongdoing. His cross-examination rather strengthens than weakens his evidence in direct.

It appeared that later Murphy executed a personal collateral note for $35,000, which was turned over to Edward J. Flynn, who appears in this case as Phelan's counsel, and given to Phelan by Mr. Flynn. Mr. Flynn had for years been Mr. Phelan's personal counsel. Naturally enough, when Phelan retired from business, Mr. Flynn became counsel for the succeeding corporation, and apparently in some matters Murphy's counsel. When these troubles developed, and conflicting interests were involved, Mr. Flynn nat-

urally retired from adverse employment, and acted for his old client, Phelan. But in the early stages of the proceedings all parties apparently dealt with him as confidant, if not counsel. Mr. Flynn—not Phelan—apparently devised the plan of having Murphy give his personal note as collateral to the corporation's note, probably then thinking it might assist in dealing with Murphy, the extent of whose wrongdoing was still seemingly under investigation. We see nothing in the transaction of Murphy's personal collateral note for $35,000, or Phelan's failure to find it after search, affecting the credibility of Phelan's general account of the transaction, or his good faith in the transaction and before the referee.

It appeared that Murphy took Phelan's $5,000 check and the $30,000 of bonds to the Atlantic Bank, and pledged the bonds as collateral for his own note for $27,500; but Murphy himself testified that "he could not say that Mr. Phelan knew that he was pledging them for his personal note."

We find nothing in the documentary evidence to support the referee's view of its inconsistency with Phelan's testimony.

On careful examination and re-examination of the evidence, we can find nothing to indicate that, until some days after November 22, Phelan had any suspicion, or the slightest reason for suspicion, that Murphy had been guilty of any wrongdoing, or was not then entitled to the implicit confidence that Phelan had always imposed in him.

We turn now to Murphy's account of the transaction: He testified:

"That on the 22d day of November, 1926, he called up Mr. Phelan at his house and asked him to come in and see him (Murphy); that he saw Mr. Phelan in the office, and that when he saw him he told him that he (Murphy) had money out of the Murphy, Gorman & Waterhouse Company that he had loaned to himself; that Mr. Phelan did not say anything to that, and that he asked Phelan if he would help him straighten the thing out; that Phelan did not say much of anything to that; that he did not tell Phelan how much money he wanted to square himself, and he did not tell him how much money he (Murphy) had out of the company.

"Q. 12. After you told him that, what did he say to you? A. He didn't say anything. I told him a lot of other things then.

"Q. 13. What else did you tell him? A. I told him that I had a note, Murphy, Gorman & Waterhouse had a note, for $32,500 that was overdue at the Atlantic National Bank, and I asked him if he wouldn't loan me some securities, or help me out, to fix that

loan up. I had loaned myself money from Murphy, Gorman & Waterhouse, and needed funds to take care of that note that day; that I was in bad shape on it. He said then that he—as I remember it, that he didn't have securities on hand to that amount, but he would take me over to the bank, and we went over to the bank, and I waited outside and he brought out some securities and a check, and I went to the Atlantic National Bank—"

We are unable to regard this story as consistent with the referee's theory that Murphy went to his old friend and patron, and confessed that he was an embezzler, and procured from him $35,000 in advances towards covering his embezzlement. If, instead of speaking to Phelan in this meager and shifting way, as he testified, he had then and there confessed his wrongdoing, it is inconceivable that Phelan would not forthwith have inquired into the situation critically, have sent for his old friend and counsel, Mr. Flynn, and under his guidance have required a general showing of the extent of Murphy's wrongdoing before he launched $35,000 of his own property into what any business man would have known, if Murphy's story of confessed embezzlement was true, was a reckless venture at rehabilitation. It is, in all essential aspects, unnatural and intrinsically incredible.

Besides, Murphy on cross-examination stated that, when examined before the trustees, he had stated "that he did not remember" that on November 22 he told Phelan "that he was personally short in his account as treasurer, and that he did not know that he had told Mr. Phelan something about the way that he had taken the money out of the company, or anything like that at that time (November 22, 1926); that in answer to a question as to whether he had told Mr. Phelan something about his status as treasurer of the company, he had said that he really did not know what he did tell Mr. Phelan that day."

His testimony before the trustees, as set forth in this record, is shifting, quibbling, and more or less inconsistent. It is the sort of testimony one would expect from a comparatively young man so incompetent (to use a mild word) as to let himself be involved in such foolish and destructive wrongdoing; he was naturally, as he testified, nervous, frightened as to what was going to happen to him, and afraid of the examining counsel.

If we take his testimony, unaffected by Phelan's credible and conflicting testimony, and weigh it in the light of its own inconsistencies and of the surrounding circumstances, we find it difficult, if not impossible,

to believe that on November 22 he confessed his wrongdoing to Phelan and obtained, in this haphazard fashion, an advance of $35,-000 to help him make up an embezzlement which he (Murphy) admits was then over $100,000, rather than that Phelan agreed to advance enough to take up overdue bank loans, to which it was in fact applied. His own story lacks all the natural incidents of a confession by a young man gone very wrong, to a kindly, paternal old friend, from whom he hoped for such relief as might save him and his company from the dire destruction naturally resulting from his misdeeds.

We are unable to adopt the referee's view that the natural and consistent story of a man of unimpeached integrity is to be found intentionally false, and that the inconsistent and unnatural story of a confessed wrong-doer is to be taken to be truthful and accurate. The referee's certificate is an unconvincing document; read with the evidence, we think it plainly wrong. His finding must be reversed.

On this record it is possible that Phelan's claim should not be allowed for the full $35,-000, the face of the note given him on November 22. His actual advances were $5,000 cash and $30,000 (at par) of bonds, which were pledged as security for Murphy's note of $27,500, and perhaps some accrued interest. Whether Phelan has any right to redeem these bonds is not clear. Nor is there anything to show the market value of the bonds. The reversal, therefore, will be without prejudice to the right of either party to any such accounting as may be necessary for the determination of the exact amount due Phelan. We limit our decision to holding that Phelan's advances were made to the bankrupt and not to Murphy.

The results are:

In No. 2159, the decree disallowing Phelan's claim must be reversed.

In No. 2164 (Phelan's appeal from the decree confirming the composition), as Phelan was a creditor, the decree must be reversed, and the case stand for a hearing on the issues raised by Phelan's objections.

On these two appeals Phelan may recover costs.

In No. 2173, Phelan's appeal is to be dismissed, without costs to either party.

The petition of the trustees and a single creditor to intervene in Nos. 2164 and 2173 is denied. The trustees are merely stakeholders, pending determination of the composition. If, on further proceedings in No. 2164 relative to the confirmation of the composition, the intervention of other creditors shall seem to the District Court appropriate, intervention may then be allowed.

In Nos. 2159 and 2164, the decrees of the District Court are reversed, and the cases are remanded to that court for further proceedings not inconsistent with this opinion; the appellant recovers costs of appeal.

In No. 2173, the appeal is dismissed, without costs to either party.

JOHNSON, Circuit Judge (dissenting). I am compelled to dissent from the majority opinion, because it is opposed to the well-established rule, not only in this circuit, but elsewhere, that an appellate court should not reverse a finding of fact by the court below, unless such finding is clearly wrong. The oral testimony in the case was conflicting, and was given by two witnesses. The referee, who saw them, and could observe their manner in testifying, believed one of these witnesses, instead of the other, and made his finding of fact upon his testimony. This finding was affirmed by the District Judge, and there is nothing in the record to show that his decision was pro forma, as stated in the majority opinion. It is to be assumed that his decision was reached after a full and adequate consideration of all the competent evidence. Where a finding of fact has been made by a referee, and affirmed by the District Judge upon review, it should not be reversed, unless clearly wrong or manifestly against the weight of evidence. Even if probabilities are to be considered, they do not, in my mind, constitute sufficient reason for disturbing the finding of fact made under such circumstances, nor can it be said that they all appear to oppose it.

Although Murphy was a confessed embezzler, there is nothing in the record to show that he had any interest in testifying that he applied to Phelan to aid him personally; nor, taking into consideration the confidential relation which existed between him and Phelan, does it seem to me improbable that he should have disclosed to Phelan that he had taken the funds of the corporation for his personal use, and wanted his assistance in replacing them. On the other hand, Phelan testified under the influence of self-interest, as it is evident that his claim would be of greater value if he could establish it as a debt of the corporation, rather than as a debt of Murphy.