# United States Court of Appeals
## FOR THE EIGHTH CIRCUIT

_____

No. 06-3421

_____

Waste Management of Minnesota, Inc.,    *
                            *

       Plaintiff - Appellee,          *
                            *    Appeal from the United States

v.                            *    District Court for the
                            *    District of Minnesota.

Transcontinental Insurance Company,    *
                            *

       Defendant - Appellant.        *

_____

Submitted: May 14, 2007
Filed: September 19, 2007

_____

Before LOKEN, Chief Judge, JOHN R. GIBSON and WOLLMAN, Circuit Judges.

_____

LOKEN, Chief Judge.

A garbage truck loaded by Waste Management of Minnesota, Inc. ("WMCo"), and driven by Chad Trenhaile jumped a highway median, rolled over, and struck the car of Brian and Ellen Ross, injuring the Rosses and Trenhaile. The Rosses commenced a state court damage action against WMCo, Trenhaile, and additional parties we will refer to as the trucking defendants. WMCo's primary liability insurance policy provided coverage of $1,000,000 for the accident, but the primary insurer, Reliance Insurance Company, became insolvent. Other parties, including WMCo's excess liability insurer, Transcontinental Insurance Company, settled the Rosses' lawsuit with an appeal pending. As the settlement left a separate personal

injury action by Trenhaile unresolved, the primary insurer's insolvency prompted this declaratory judgment action to determine whether Transcontinental must indemnify and defend WMCo in that action. Transcontinental now appeals the district court's[1] adverse decision. The parties agree that Minnesota law governs the dispute and that no contested issues of fact remain. Reviewing the interpretation of Transcontinental's policy and the grant of summary judgment *de novo*, we affirm. See Travelers Indem. Co. v. Bloomington Steel & Supply Co., 718 N.W.2d 888, 894 (Minn. 2006) (standard of review).

## I.

The parties to the Ross lawsuit agreed to binding arbitration. The arbitrator found that Trenhaile and WMCo were each 50% at fault and that the Rosses were entitled to damages of approximately $3,050,000. The Rosses sought confirmation of the award. The Minnesota trial court entered judgment for the full amount against Trenhaile and WMCo jointly and also decided priority of coverage issues between the trucking defendants' liability insurer (Tri-State), the Rosses' underinsured motorist insurer (MSI), Transcontinental, and the Minnesota Insurance Guaranty Association ("MIGA"), which was obligated by statute to pay certain claims against the insolvent primary insurer, Reliance. See MINN. STAT. §§ 60C.01 *et seq.* Tri-State then paid the Rosses its policy limit of $750,000 on account of Trenhaile's fault, leaving approximately $2,300,000 unpaid. Three other parties appealed the trial court's judgment -- WMCo, Transcontinental, and MIGA.

With the appeal pending, the parties entered into a settlement agreement, and the Minnesota Court of Appeals dismissed the appeal. Pursuant to a Stipulation of Dismissal, the trial court then entered an order dismissing all claims with prejudice.

---

[1]The HONORABLE DONOVAN W. FRANK, United States District Judge for the District of Minnesota.

The settlement agreement provided that no party admitted liability or coverage, and the dismissal order left "unaffected" WMCo's statutory right to collect from Trenhaile amounts WMCo paid to the Rosses in excess of its 50% share of the joint liability. See MINN. STAT. § 548.19. One month after the dismissal, the Rosses filed a satisfaction of judgment. As a result of these actions, the parties to the settlement paid the portion of the Rosses' judgment not paid by Tri-State as follows:

| | |
|---|---|
| MIGA | $555,000 |
| MSI | 250,000 |
| WMCo | 150,000 |
| Transcontinental | 1,320,731 |
| Ross Judgment Reduction | 30,000 |
| | |
| Total | $2,305,731 |

WMCo tendered defense and indemnity of the separate Trenhaile suit to Transcontinental as its excess liability insurer. Transcontinental denied a duty to defend or indemnify, explaining:

> Transcontinental's . . . obligation is triggered only when the obligation of underlying insurers ceases solely through exhaustion of underlying limits through payment of covered . . . settlement or judgments. Here, Reliance . . . is the scheduled underlying insurer, with limits of $1 million. . . . [T]he payments of Waste Management and MIGA in the Ross case total $705,000. MSI's payment of $250,000 does not count . . . because it was . . . . the Rosses' own first-party coverage. . . . [N]o portion of Tri-State's payment satisfies the $1 million . . . . At most, Tri-State provided Waste Management with "unscheduled underlying insurance."

This declaratory judgment lawsuit followed. The district court held that the payments pursuant to the Ross settlement exhausted the Reliance policy limit, triggering Transcontinental's duties to defend and indemnity WMCo in the Trenhaile lawsuit.

-3-

## II.

Transcontinental issued WMCo a commercial umbrella liability policy providing coverage of $25,000,000 per incident after exhaustion of WMCo's primary insurance coverage.  Section III(3) provided that Transcontinental was liable for "the 'ultimate net loss' in excess of: [t]he applicable limits of 'scheduled underlying insurance' . . . plus the limits of any 'unscheduled underlying insurance.'"  The Reliance policy with a limit of $1,000,000 for a single accident was listed in the Schedule of Underlying Insurance.  "Ultimate net loss" was defined as "actual damages the insured is legally obligated to pay, either through: (1) final adjudication on the merits; or (2) through compromise settlement."

## A.

Section IV(1) of Transcontinental's policy specifically addressed the problem of a primary insurer's insolvency:

> **1. Financial Impairment**
> Bankruptcy . . . or other financial impairment of . . . an "underlying insurer" shall neither relieve nor increase any of our obligations under this policy.  In the event there is diminished recovery or no recovery available to [WMCo] as a result of . . . financial impairment of an insurer providing "scheduled underlying insurance," the coverage under this policy shall apply only in excess of the limits of liability stated in the "scheduled underlying insurance."  Under no circumstances shall we be required to drop down and . . . assume the obligations of a financially impaired insurer.

As insurer insolvencies have become more common, the issue of whether an excess insurer is obligated to "drop down" and assume the responsibilities of an insolvent primary insurer has been frequently litigated.  Employing various theories, some jurisdictions have required excess insurers to insure the full loss when the primary

insurer is insolvent. Minnesota has not. See Am. Hoist & Derrick Co. v. Employers' of Wausau, 454 N.W.2d 462, 466-67 (Minn. App. 1990); Seaway Port Auth. of Duluth v. Midland Ins. Co., 430 N.W.2d 242, 248-50 (Minn. App. 1988). Thus, it is undisputed that the "no drop down" provision in Section IV(1) of Transcontinental's policy would be enforced according to its terms under Minnesota law. The essential term of that provision is that Reliance's insolvency "shall neither relieve nor increase" Transcontinental's obligations under the excess policy.

On appeal, Transcontinental argues at length that the district court's decision violates the policy's no-drop-down provision. We disagree. When the Ross litigation was settled, Tri-State had paid the Rosses $750,000, and WMCo was jointly liable for the unpaid $2,300,000 balance of the trial court's judgment, subject to the pending appeal. If solvent, Reliance would have been obligated to pay that judgment up to its $1,000,000 policy limit, and Transcontinental as WMCo's excess insurer would have been obligated to pay the $1,300,000 balance. Then, with the Reliance policy limits exhausted by the Ross litigation, Transcontinental would have been obligated to defend and indemnify WMCo in the separate lawsuit by the other party injured in the accident, Trenhaile.

That, in substance, is what the Ross settlement and the district court's decision have accomplished. Under the settlement, various parties contributed the $1,000,000 that Reliance otherwise would have paid, and Transcontinental paid the rest of the $2,300,000. It is true that $15,000 of the $1,320,000 paid by Transcontinental constituted a portion of the first $1,000,000 that would otherwise have been paid by Reliance. But the trial court judgment on appeal had imposed a significant "drop down," requiring MIGA to pay the first $600,000 of the remaining $2,300,000, and Transcontinental to pay the rest. Transcontinental had good reason to voluntarily pay $15,000 to resolve this potential liability; it does not violate a no-drop-down provision to settle a potential drop-down exposure. Thus, the district court's decision is true to the mandate in Section IV(1) of the policy that Reliance's insolvency "neither relieve

nor increase" Transcontinental's obligations as excess insurer. We still must consider whether that decision was true to other policy provisions, but Transcontinental's no-drop-down argument is a red herring.

**B.**

Transcontinental argues that its obligations as excess insurer do not arise until the Reliance $1,000,000 policy limit is exhausted and that only payments made by Reliance or by WMCo itself "count" toward exhaustion of that limit. Therefore, Transcontinental argues, its duties to defend and indemnify WMCo in the Trenhaile action have not yet attached because the first $1,000,000 of the Ross settlement included payments from four sources that did not count toward exhausting the Reliance policy limit -- $555,000 from MIGA, $250,000 from MSI, $15,000 from Transcontinental, and the Rosses' agreement to reduce their judgment by $30,000.

Our problem with this argument is that the policy obligates Transcontinental to pay any "ultimate net loss" in excess of the Reliance policy limit. "Ultimate net loss" is defined, not as the amounts *paid* by Reliance or WMCo, but as the damages WMCo is *"legally obligated to pay"* by reason of a "final adjudication on the merits" or a "compromise settlement" (emphasis added). This is not an unusual way to define the point at which a primary insurer's coverage has been exhausted. As we said in a case governed by Missouri law, "exhaustion did not require an insurer to pay the full dollar value of a policy. Rather, an insurance policy is exhausted when the insured proves that claims aggregating the full amount of the specific policy have been settled thereunder and full liability of the insurer discharged." Reliance Ins. Co. in Liquidation v. Chitwood, 433 F.3d 660, 664 (8th Cir. 2006) (quotation omitted). Minnesota law is not to the contrary, at least when, as here, there is no hint of collusion between the insured, the primary insurer, and the plaintiff whose lawsuit is being settled. See Drake v. Ryan, 514 N.W.2d 785, 788-89 (Minn. 1994).

-6-

In its reply brief, Transcontinental finally identifies a policy provision that allegedly supports its payments theory of primary policy exhaustion. Section III(4), described by Transcontinental as an Exhaustion Clause, provided in relevant part:

> In the event of . . . exhaustion of the aggregate limits of liability under "scheduled underlying insurance" *solely by reason of payments* of a combination of covered [settlements or judgments] paid thereunder as a result of "incidents" . . . this policy shall, subject to this limit of liability provision and to the remaining terms and provisions and conditions of this policy . . . apply in place of the exhausted amount of "scheduled underlying insurance." (Emphasis added.)

Under Section III(4), Transcontinental asserts, only amounts paid by Reliance toward the <u>Ross</u> settlement or judgment count toward exhausting its policy limit.

This contention has all the earmarks of an afterthought, and we are inclined to reject it for that reason alone. Even considering the argument on the merits, however, we find it unpersuasive. This interpretation of Section III(4) contradicts the plain meaning of provisions declaring that Transcontinental's duties to defend and indemnify arose when WMCo became "legally obligated to pay" more than $1,000,000. As the Fifth Circuit said in applying a comparable policy provision, "This does not mean that underlying insurers must actually pay before excess policies are triggered. It means that their obligation to do so must be finally determined." <u>Fed. Ins. Co. v. Srivastava</u>, 2 F.3d 98, 103 n.5 (5th Cir. 1993). Moreover, Section III(4) refers to "incidents," in the plural, and to "aggregate limits of liability," all of which strongly suggests that the provision applies when there are multiple covered accidents occurring during the policy period. In that situation, the limitation, "solely by reason of payments . . . paid thereunder," ensures that the primary insurer's policy limit would not be deemed exhausted solely by its insolvency, which would impose a form of drop-down liability on the excess insurer. Finally, Transcontinental's construction of

Section III(4) would "relieve" it of policy obligations on account of Reliance's insolvency, contrary to the Financial Impairment Clause, Section IV(1).

For these reasons, we conclude that the critical question is whether WMCo became "legally obligated to pay" the $2,300,000 unpaid balance of the Ross judgment. In our view, this question has a simple answer. The policy defined ultimate net loss as damages WMCo is legally obligated to pay through final adjudication on the merits. "An order or judgment becomes final after the appellate process is terminated." Dixon v. Depositors Ins. Co., 619 N.W.2d 752, 755 (Minn. App. 2000) (quotation omitted). Accordingly, the Ross judgment became an ultimate net loss when the Minnesota Court of Appeals dismissed the pending appeal from the trial court's final judgment in the Rosses' favor. Transcontinental objects that the Ross lawsuit was really ended by settlement. But after the appellate court's dismissal, if everyone except WMCo and Transcontinental had reneged on the settlement agreement and their statutory and contractual obligations, WMCo would have been liable to the Rosses for $1,000,000, the Reliance policy limit, and Transcontinental would have been liable to indemnify WMCo for the remainder of the judgment. Under this view of the Ross litigation, Transcontinental's duties to defend and indemnify WMCo in Trenhaile are not measured by who paid what in the Ross settlement. Rather, they are measured by the $2,300,000 WMCo became "legally obligated to pay" as a result of the final adjudication of the Ross suit on the merits. Thus, Ross shattered the $1,000,000 Reliance policy limit, and Transcontinental must defend and indemnify WMCo in the Trenhaile lawsuit, which arose out of the same incident.

The district court concluded that it need not decide whether the Ross lawsuit ended by "final adjudication on the merits" because, in any event, the settlement agreement exhausted the Reliance policy limit. On appeal, Transcontinental argues at length why settlement contributions by MIGA, MSI, Transcontinental, and the Rosses toward the first $1,000,000 of the total settlement payments did not count

toward exhausting the Reliance policy limit. On these issues, we agree with the district court. No matter how each of these payors is described in relation to the Transcontinental policy, each contributed to the <u>Ross</u> settlement "as a result of Reliance's insolvency after Waste Management was found to be liable." MIGA's statutory obligation to pay any portion of the Rosses' claims arose entirely because of Reliance's insolvency. The exposure of MSI as the Rosses' underinsured motorist insurer arose only because Reliance's insolvency caused the defendants in the <u>Ross</u> litigation to be partially underinsured. And of course the Rosses would not have reduced their judgment by $30,000 and Transcontinental would not have paid $15,000 of the first $1,000,000 had a solvent Reliance been available to pay its policy limit. In these circumstances, we agree with the district court that the payments made to satisfy the <u>Ross</u> settlement, individually and in total, resulted in exhausting the Reliance policy limits, thereby triggering Transcontinental's duties to defend and indemnify WMCo in the <u>Trenhaile</u> lawsuit. A contrary ruling would result in the Reliance insolvency relieving Transcontinental of its preexisting contractual duties as an excess insurer, contrary to the Financial Impairment policy provision.

The judgment of the district court is affirmed. Appellee's motion to strike is denied.

_____