*Fireman's Fund Ins. Co. v. OneBeacon Ins. Co.*

In the

# United States Court of Appeals
## For the Second Circuit

August Term 2021

(Argued:  May 20, 2022     Decided: September 15, 2022)

Docket No. 20-4282

FIREMAN'S FUND INSURANCE COMPANY,

*Plaintiff-Appellee,*

–v.–

ONEBEACON INSURANCE COMPANY, AS SUCCESSOR-IN-INTEREST TO GENERAL
ACCIDENT INSURANCE COMPANY OF AMERICA,

*Defendant-Appellant.*

B e f o r e :

LIVINGSTON, *Chief Judge*, and RAGGI and CARNEY, *Circuit Judges*.

Defendant-Appellant OneBeacon Insurance Company reinsured one of three
excess insurance policies issued by Plaintiff-Appellee Fireman's Fund Insurance
Company to policyholder ASARCO, Inc. After developing significant potential liability
on claims made by asbestos-injured claimants, ASARCO sought coverage from
Fireman's Fund under all of its excess policies. ASARCO and Fireman's Fund

ultimately settled all of the claims under the three policies. Fireman's Fund allocated a portion of that settlement to the policy reinsured by OneBeacon and sought reinsurance coverage on the allocated sum. OneBeacon rejected Fireman's Fund's claim, arguing that the settlement allocation violated the terms of the excess and reinsurance policies. This suit by Fireman's Fund resulted. The district court granted summary judgment to Fireman's Fund, and OneBeacon now appeals. On *de novo* review, we agree with the district court that Fireman's Fund's allocation of a portion of the settlement to the excess policy reinsured by OneBeacon was not contrary to that policy's exhaustion requirement or to the terms of the reinsurance policy. OneBeacon is therefore obligated under the reinsurance policy's follow-the-settlements clause to provide the requested coverage.

**AFFIRMED.**

———————

STEVEN C. SCHWARTZ, Chaffetz Lindsey LLP, New York, NY, *for Plaintiff-Appellee Fireman's Fund Insurance Company.*

ADAM R. DOHERTY (Mitchell S. King, Thomas M. Elcock, *on the brief*), Prince Lobel Tye LLP, Boston, MA, *for Defendant-Appellant OneBeacon Insurance Company.*

———————

CARNEY, *Circuit Judge*:

This dispute arises from a reinsurance policy that Defendant-Appellant OneBeacon Insurance Company's predecessor-in-interest issued to Plaintiff-Appellee Fireman's Fund Insurance Company. The policy reinsured one of three excess insurance policies that Fireman's Fund issued to ASARCO, Inc., for two policy years in the early 1980s. Two of Fireman's Fund's policies each provided ASARCO with $20 million in coverage for losses in excess of $30 million in one of the two years, whereas its third policy—the policy reinsured by OneBeacon—provided $20 million in coverage for losses in excess of $75 million in the latter year. All coverage limits were in excess of a $3 million self-insured retention. By 2001, ASARCO was facing hundreds of millions of dollars in potential liability arising from its subsidiaries' involvement in the asbestos

2

industry, and sought coverage from Fireman's Fund and its other insurers. After ten years of litigation, Fireman's Fund ultimately agreed to pay ASARCO $35 million in settlement of ASARCO's claims under all three of the excess policies.

To pursue reinsurance on the settled claims, Fireman's Fund then allocated the settlement amount among the three excess policies in proportion to its calculation of the policies' likely respective exposures. This resulted in an allocation of $8.1 million (in round figures) to the OneBeacon policy.[1] In 2013, Fireman's Fund sought reinsurance coverage from OneBeacon for a percentage of that amount. OneBeacon denied the claim based on its position that Fireman's Fund should have allocated the entire settlement amount to the other two excess policies. Fireman's Fund then initiated the present breach-of-contract action.

On review of the parties' cross-motions for summary judgment, the district court rejected OneBeacon's argument that Fireman's Fund's allocation of a portion of the settlement to the third policy was contrary to the policy's exhaustion requirement. Instead, the district court concluded, the exhaustion requirement could be met through a below-limits settlement of the underlying policy, and OneBeacon therefore had no basis for challenging Fireman's Fund's allocation of a portion of the settlement amount to the third policy. *See generally Fireman's Fund Ins. Co. v. OneBeacon Ins. Co.*, 495 F. Supp. 3d 293 (S.D.N.Y. 2020) (Gardephe, *J.*).

On review, we agree with the district court that the third policy's terms did not unambiguously require exhaustion of the underlying insurance policies through actual payment of the policy limits by the underlying insurers. Accordingly, under the applicable caselaw, the underlying policies could be exhausted by a below-limits settlement and the third policy would cover so long as the policyholder's total covered

---

[1] Fireman's Fund allocated just over $13.6 million to the first policy and $13.2 million to the second policy. Those two policies were reinsured by various other insurers.

losses exceeded the policy's attachment point. Because ASARCO's losses exceeded the third policy's attachment point, Fireman's Fund could reasonably allocate a portion of the settlement to that policy.

As did the district court, we also reject OneBeacon's contention that the reinsurance policy itself required payment of policy limits in full by the underlying primary and excess insurers before reinsurance coverage would attach. Because Fireman's Fund's allocation was not contrary to the terms of any of the applicable policies, the reinsurance policy's follow-the-settlements clause binds OneBeacon to honor the allocation. We therefore AFFIRM the judgment of the district court.

## BACKGROUND[2]

### I.    The Excess Insurance and Reinsurance Policies

ASARCO—a mining, smelting, and refining company—obtained three excess insurance policies from Fireman's Fund in the early 1980s. These and other excess insurance policies issued by various insurers to ASARCO in those years provided ASARCO with coverage for a set amount beyond the upper limit of each year's underlying primary liability policy, which it obtained from yet other insurers. *See Ali v. Fed. Ins. Co.*, 719 F.3d 83, 86 (2d Cir. 2013) (discussing principles of excess liability insurance).

Each of the three excess policies that Fireman's Fund issued to ASARCO in that period provided coverage for $20 million in losses. They had similar coverage terms but applied to varying policy years and had different attachment points (that is, points at which excess coverage was triggered):

---

[2] The facts as set forth here are drawn from the summary judgment record and are undisputed by the parties unless otherwise noted.

4

- **Policy 1** covered $20 million in losses in excess of $30 million for the year from March 15, 1982, to March 15, 1983;
- **Policy 2** covered $20 million in losses in excess of $30 million for the year from March 15, 1983, to March 15, 1984; and
- **Policy 3** covered $20 million in losses in excess of $75 million, also for the year from March 15, 1983, to March 15, 1984.[3]

Coverage provided by each of these policies was in excess also of a $3 million self-insured retention (sometimes, "SIR")—an uninsured portion that ASARCO undertook to pay itself before it was entitled to call on policy coverage.

ASARCO's layers of insurance for the years March 1982 to March 1983, and March 1983 to March 1984, can be visualized as "coverage towers," as diagrammed by OneBeacon and reproduced below.[4]

---

[3] The policy documents identified Policy 1 as No. XLX 1481698; Policy 2 as No. XLX 1534773; and Policy 3 as No. XLX 1534774.

[4] OneBeacon's chart copies the relevant portion of the coverage chart provided by ASARCO in the underlying coverage litigation.

Tower Limits: $103M

| New Eng. Re $5M |
| Fireman's Fund "Policy 3" $20M |
| Prudential $10M |
| Twin City Fire $15M |

Tower Limits: $53M

| Fireman's Fund "Policy 1" $20M | Fireman's Fund "Policy 2" $20M |
| Hartford (25%) Prud. (25%) London UW (50%) $22M | Hartford (25%) Prud. (25%) London UW (50%) $22M |
| London UW (50%) and New Eng. Re (50%) $5M | London UW (50%) and New Eng. Re (50%) $5M |
| American Home $3M | American Home $3M |
| SIR $3M | SIR $3M |
| 1982-1983 | 1983-1984 |

*See* Appellant's Br. at 8; *see also* App'x at 1279.

Pivotal here are two clauses in Fireman's Fund's three excess policies: "Payment of Loss" and "Limit of Liability." In relevant part, they provide:

> Payment of Loss. It is a condition of this policy that the insurance afforded under this policy shall apply only after all underlying insurance has been exhausted. Upon final determination by settlement, award or verdict of the liability of the Insured, [Fireman's Fund] shall promptly pay the Insured as the Insured shall pay, or be required to pay, the amounts of any losses falling within the terms or limits of this insurance. . . .

> Limit of Liability. [Fireman's Fund] shall be liable only for the limit of liability stated in Item 3 of the Declarations in excess of the limit or limits of liability of the applicable underlying insurance policy or policies all as stated in the declarations of this policy. The limit of the liability stated in the declarations as applicable to "each occurrence" shall be the total limit of

[Fireman's Fund's] liability for all damages sustained as the result of any one occurrence, provided, however, in the event of reduction or exhaustion of the applicable aggregate limit or limits of liability under said underlying policy or policies solely by reason of losses paid thereunder on account of occurrences during this policy period, this policy shall in the event of reduction, apply as excess of the reduced limit of liability thereunder. Subject to the applicable limit of liability as respects each occurrence, the limit of liability stated in the declarations as "aggregate" shall be the total limit of [Fireman's Fund's] liability for all damages sustained during each annual period of this policy . . . .

App'x at 186, 188.

Fireman's Fund obtained reinsurance for Policies 1, 2, and 3.[5] For Policy 3, General Accident Insurance Company issued a reinsurance policy (or "Facultative Certificate") pursuant to which General Accident assumed "$3,000,000 [part of] $20,000,000 excess of $75,000,000 excess of underlying" self-insured retention. *Id.* at 198. This meant that General Accident covered a 15% share of the risk Fireman's Fund assumed under Policy 3: $3 million of the $20 million that Fireman's Fund had undertaken to cover as excess insurer.

The reinsurance contract for Policy 3 included a "follow-form" clause. It provided that "the liability of the Reinsurer [General Accident] . . . shall follow that of [Fireman's Fund] and except as otherwise specifically provided herein, shall be subject in all respects to all the terms and conditions of [Fireman's Fund's] policy" with ASARCO. *Id.* at 199. It also included a "follow-the-settlements" clause. That clause specified that "[a]ll claims involving this reinsurance, when settled by [Fireman's

---

[5] Through a reinsurance contract or "certificate," the reinsurer assumes a portion of the risk borne by the original insurer (the "reinsured" or "cedent") in exchange for a premium. *See N. River Ins. Co. v. Ace Am. Reinsurance Co.*, 361 F.3d 134, 137 (2d Cir. 2004).

Fund], shall be binding on the Reinsurer, who shall be bound to pay its proportion of such settlements ."[6] *Id.* OneBeacon is the successor-in-interest to General Accident.[7]

## II.      The ASARCO Litigation and Settlement

In the 1980s, ASARCO began to face significant liability for asbestos-related personal injury claims. In 2001, ASARCO filed suit in Texas courts seeking coverage on those claims from Fireman's Fund and its other insurers. By 2005, a still-worsening onslaught of lawsuits left it unable to continue operating, and so ASARCO sought bankruptcy protection under Chapter 11, while its coverage suit was still pending.

Four years later, in late 2009, the district court confirmed ASARCO's plan of reorganization, upon the bankruptcy court's favorable report and recommendation. *See In re ASARCO LLC*, 420 B.R. 314, 317–18, 357–58 (S.D. Tex. 2009). The plan included the establishment, pursuant to section 524(g) of the Bankruptcy Code, of the "ASARCO Asbestos Personal Injury Settlement Trust" (the "Trust").[8] App'x at 1150. The Trust

---

[6] A "follow-form" clause effectively means that the reinsurer's "liability is 'concurrent with,' or the same as, [the reinsured's] liability under the underlying policy." *Glob. Reinsurance Corp. of Am. v. Century Indem. Co.*, 22 F.4th 83, 89 (2d Cir. 2021). Relatedly, a "follow-the-settlements" clause "insulates a reinsured's liability determinations from challenge by a reinsurer, so long as the settlement decision was made in good faith, reasonable, and within the terms of the applicable policies," as explained further below. *See Utica Mut. Ins. Co. v. Fireman's Fund Ins. Co.*, 957 F.3d 337, 346 (2d Cir. 2020) (internal quotation marks and brackets omitted). Both provisions are present in this reinsurance contract, and we have observed that under New York law they impose distinct obligations. *See Utica Mut. Ins. Co. v. Clearwater Ins. Co.*, 906 F.3d 12, 24 & n.11 (2d Cir. 2018).

[7] OneBeacon has since become Bedivere Insurance Company, but we refer to it here as OneBeacon, consistent with the parties' usage.

[8] Section 524(g) was enacted to address a critical problem posed by asbestos-related bankruptcies, namely that, because of the delayed onset of many asbestos-related illnesses, "potential claimants against an asbestos manufacturer's bankruptcy estate may not know of their claims until years after the estate has been depleted by other claimants whose symptoms

8

assumed some of ASARCO's asbestos-related liabilities and its corresponding insurance rights.

Meanwhile, Fireman's Fund and ASARCO continued to litigate their excess coverage insurance dispute. Fireman's Fund maintained that its excess policies' asbestosis exclusions, as well as the proper distribution of ASARCO's liabilities among policy years and its primary insurers, would largely free Fireman's Fund from liability. ASARCO argued, contrarily, that Fireman's Fund was obligated to pay the full limits of excess Policies 1, 2, and 3, because ASARCO's estimated past, present, and future liability exposure for asbestos-related claims ranged from $400 million to $2.1 billion. In 2008, the parties participated in mediation, but perhaps unsurprisingly were unable to reach a settlement.

After that unsuccessful mediation, however, Fireman's Fund suffered a series of unfavorable decisions by the Texas state court. These led its attorneys, actuaries, and claims professionals to conclude that its likely exposure on the three excess policies was $50.3 million as discounted to present value. Payment of that sum would leave Policies 1 and 2 fully paid out and Policy 3 still substantially exposed. Motivated by this new perspective, the parties returned to the negotiating table and in 2011 reached settlement terms: Fireman's Fund agreed to pay $35 million to the ASARCO Trust in return for a release.

Fireman's Fund then decided to allocate the $35 million payment to Policies 1, 2, and 3 in proportion to the amount that its most recent exposure analysis—the one that prompted the settlement—estimated Fireman's Fund would be required to pay under

became apparent earlier." *In re Quigley Co.*, 676 F.3d 45, 58–59 (2d Cir. 2012). Section 524(g) therefore permits a bankruptcy court to enter "an injunction 'channeling' certain classes of claims to a trust set up in accordance with the reorganization plan, which trust will then make payments to both present and future claimants." *Id.* at 59 (citing 11 U.S.C. § 524(g)(1)–(2)).

each policy had the litigation proceeded. Policy 3 received an allocation of about $8.1 million.

### III. The Instant Dispute

In 2013, Fireman's Fund submitted an invoice to OneBeacon for OneBeacon's 15% portion of the $8.1 million settlement payment allocated to Policy 3, plus expenses. OneBeacon denied Fireman's Fund's claim, taking the position that the $35 million settlement payment should have been allocated entirely to Policies 1 and 2. Fireman's Fund then commenced the instant breach-of-contract action against OneBeacon in the U.S. District Court for the Southern District of New York.

Following discovery, the parties each moved for summary judgment. The district court denied the motions without prejudice and ordered supplemental briefing. In October 2020, the court ultimately awarded summary judgment to Fireman's Fund.

In reaching its decision, the district court concluded that, under the reinsurance policy's "follow-the-settlements" provision, OneBeacon was bound by Fireman's Fund's reasonable allocation of part of the settlement to Policy 3. The court rejected OneBeacon's argument that because Fireman's Fund's settlement allocation did not provide for full payment of the limits of Policies 1 and 2—that is, because it allocated less than $20 million to each of those policies—those underlying policies were not yet exhausted, precluding any allocation to Policy 3 under the terms of both Policy 3 and the reinsurance contract. Instead, the court concluded that the exhaustion requirement found in Policy 3 was ambiguous and could be satisfied by a below-limits settlement of the underlying policies.[9]

---

[9] The district court also rejected OneBeacon's argument that Fireman's Fund's Rule 30(b)(6) deponent conceded that Policy 3 unambiguously defines the term "exhaustion." *Fireman's Fund,*

OneBeacon timely appealed.

## DISCUSSION

We review *de novo* the district court's grant of a motion for summary judgment. *New York v. Mountain Tobacco Co.*, 942 F.3d 536, 541 (2d Cir. 2019). Summary judgment should be granted if "there is no genuine dispute as to any material fact and the movant is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(a). We apply the same standard where "the parties filed cross-motions for summary judgment and the district court granted one motion, but denied the other." *Morales v. Quintel Ent., Inc.*, 249 F.3d 115, 121 (2d Cir. 2001) (citing *Terwilliger v. Terwilliger*, 206 F.3d 240, 244 (2d Cir. 2000)).

"Under New York law, 'an insurance contract is interpreted to give effect to the intent of the parties as expressed in the clear language of the contract.'"[10] *Morgan Stanley Grp. Inc. v. New England Ins. Co.*, 225 F.3d 270, 275 (2d Cir. 2000) (quoting *Village of Sylvan Beach v. Travelers Indem. Co.*, 55 F.3d 114, 115 (2d Cir. 1995)). "[T]he initial interpretation of a contract is a matter of law for the court to decide," as is the "threshold question" of "[w]hether a contract is ambiguous." *Parks Real Est. Purchasing Grp. v. St. Paul Fire & Marine Ins. Co.*, 472 F.3d 33, 42 (2d Cir. 2006).

Where, as here, the reinsurance contract contains a "follow-the-settlements" clause, the reinsurer must indemnify the reinsured for the settled claim "as long as the settlement decision 'is in good faith, reasonable, and within the terms of the applicable policies.'" *Utica Mut. Ins. Co. v. Fireman's Fund Ins. Co.* ("*Utica*"), 957 F.3d 337, 341 (2d Cir. 2020) (brackets omitted) (quoting *Travelers Cas. & Sur. Co. v. Gerling Glob.*

---

495 F. Supp. 3d at 308. OneBeacon does not press this argument on appeal, and we therefore do not consider it. *See Graves v. Finch Pruyn & Co.*, 457 F.3d 181, 184 (2d Cir. 2006).

[10] The district court applied New York law to the present dispute, and on appeal the parties do not object to that choice of law.

11

*Reinsurance Corp. of Am.*, 419 F.3d 181, 190 (2d Cir. 2005)). The follow-the-settlements principle applies also "to a cedent's post-settlement allocation decisions, . . . as long as the allocation meets the typical follow-the-settlements requirements."[11] *N. River Ins. Co. v. Ace Am. Reinsurance Co.*, 361 F.3d 134, 141 (2d Cir. 2004). Importantly, a follow-the-settlements provision "does not alter the terms or override the language" of the policies at issue. *Utica*, 957 F.3d at 347 (internal quotation marks omitted) (quoting *U.S. Fid. & Guar. Co. v. Am. Re-Ins. Co.*, 20 N.Y.3d 407, 420 (2013)). Instead, "it simply requires payment where the cedent's good-faith payment is at least arguably within the scope of the insurance coverage that was reinsured." *Id.* at 348 (internal quotation marks omitted) (quoting *Mentor Ins. Co. (U.K.) v. Brannkasse*, 996 F.2d 506, 517 (2d Cir. 1993)).

On appeal, OneBeacon argues that Fireman's Fund's allocation of a portion of the ASARCO settlement to Policy 3 violated both that policy's exhaustion requirement as well as the terms of reinsurance policy itself, and that it therefore lies outside the coverage scope of both. OneBeacon interprets Policy 3 and the reinsurance policy to require Fireman's Fund to have paid the full limits of Policies 1 and 2—and, presumably, for all other underlying insurers to have paid the full limits of their respective policies—before those underlying policies can be considered to be exhausted or before coverage will lie under the reinsurance policy. Accordingly, to resolve whether the "follow-the-settlements" clause binds OneBeacon to Fireman's Fund's allocation decision, we must first determine whether OneBeacon's interpretation is correct.

---

[11] The reader will recall that the term "cedent" is used interchangeably with "reinsured" to refer to the party receiving reinsurance coverage. *See supra* note 5.

## I. Policy 3's Exhaustion Requirement

### A. *Policy 3's provisions related to exhaustion do not unambiguously require payment in full of underlying limits of liability by underlying insurers; they instead permit exhaustion by a below-limits settlement*

Our first task is to interpret Policy 3's exhaustion requirement. OneBeacon urges that two provisions in Policy 3—specifically, those titled "Payment of Loss" and "Limit of Liability"—preclude coverage unless the underlying insurers pay in full the limits of liability of the underlying policies. Ultimately, we agree with Fireman's Fund that Policy 3's language does not preclude exhaustion of the underlying insurance by a below-limits settlement, so long as the policyholder's covered losses exceed the underlying policy's limit of liability. We spell this out in greater detail below.

#### 1. *The Payment of Loss provision does not define exhaustion, and so, under* Zeig, *a below-limits settlement may be sufficient to exhaust.*

We turn first to the language of the applicable provisions. The Payment of Loss provision, while providing that Policy 3 "shall apply only after all underlying insurance has been exhausted," does not define the term "exhausted." App'x at 193. As the district court concluded, the applicable precedent tells us that this provision standing alone does not unambiguously require actual payment up to the policy limits by the underlying insurers.

Our opinion in *Zeig v. Massachusetts Bonding & Insurance Co.* set out a general principle for interpreting exhaustion provisions in excess insurance policies.[12] 23 F.2d

---

[12] Although we have observed that *Zeig*, which issued before *Erie R.R. Co. v. Tompkins*, 304 U.S. 64 (1938), interpreted pre-*Erie* "freestanding federal common law," *Ali*, 719 F.3d at 92 n.16, courts applying New York law have consistently adhered to *Zeig*'s holding. *See Carrier Corp. v. Allstate Ins. Co.*, 113 N.Y.S.3d 472, at *9-10 (N.Y. Sup. Ct. 2018) ("The law is clear in New York that when a policyholder enters into a compromise Settlement Agreement with an underlying insurer for less than its full coverage rights, an excess carrier is obligated to provide coverage so long as the policyholder absorbs the gap between the underlying insurer's payment and the

665 (2d Cir. 1928) (Hand, A., *J.*). In that case, Zeig, a dressmaker whose shop was burglarized, settled with his primary insurers for $6,000, well below the $15,000 limit on those policies. *Id.* at 665. His excess insurer, however, refused to pay any amount, relying on a provision in the excess insurance contract that provided that the excess policy "shall apply and cover only after all other insurance herein referred to shall have been exhausted in the payment of claims to the full amount of the expressed limits of such other insurance." *Id.* The insurer argued that the exhaustion provision required Zeig to collect the full $15,000 from the underlying insurers before recovering any amount under the excess policy. *Id.* at 666.

We disagreed, explaining that, although the parties could have included a requirement of actual payment in the excess insurance contract, they had not done so. *Id.* The exhaustion requirement, as written, did not preclude exhaustion by a below-limits settlement that discharged claims up to the limits of the primary policies. *Id.* We observed that a stringent construction of this ambiguous language was inappropriate because the excess insurer would be required only to "pay such portion of the loss as was in excess of the limits of those policies"—that is, would not be required to cover Zeig's losses *below* $15,000—and therefore would have "no rational interest in whether the insured collected the full amount of the primary policies." *Id.* Additionally, we explained, such a requirement as the excess insurer proposed would cause delay, promote litigation, and impede settlement. *Id.* Finding this "result harmful to the insured, and of no rational advantage to the insurer," we concluded that it "ought only to be reached when the terms of the contract demand it." *Id.*

---

attachment point of the excess policy . . . [unless the] excess policy contains language which clearly requires that exhaustion occur solely as a result of actual payments." (citing *Zeig*, 23 F.2d 665)), *modified in other part*, 133 N.Y.S.3d 697, 699 (2020).

Here, because the Payment of Loss provision in Policy 3 does not specify any particular form of exhaustion, a below-limits settlement of the underlying policies is sufficient to exhaust under *Zeig* absent unambiguous exhaustion language elsewhere in the contract. OneBeacon concedes that *Zeig* generally applies when the exhaustion language in an insurance policy is ambiguous. It contends, however, that the *Zeig* rule does not control here because in its view we overruled *Zeig* in *Ali v. Federal Insurance Co.*, at least in the context of liability insurance. 719 F.3d 83 (2d Cir. 2013). We turn now to examining that contention.

In *Ali*, we determined that an exhaustion clause "stat[ing] that the excess insurance coverage attaches only after a certain amount of underlying insurance coverage is exhausted 'as a result of payment of losses thereunder'" unambiguously required there to be actual payment of the underlying losses—not merely liability to pay—before the excess coverage was triggered. *Id.* at 86, 92–93. In distinguishing *Zeig*, we explained that "nothing is inherently errant or unusual about interpreting an exhaustion clause in an excess *liability* insurance policy differently than a similarly written clause in a first-party *property* insurance policy." *Id.* at 93 (emphasis in original). This is because in the absence of a fixed amount of loss—as was the case in *Zeig*, involving stolen property—policyholders might artificially inflate their liability when settling with injured plaintiffs in order to access an additional layer of coverage. *Id.* at 93–94. Accordingly, in the liability insurance context, excess insurers may have an interest in securing a provision that requires actual payment up to the underlying limits. *See id.*

But *Ali* did not create a reverse-*Zeig* rule for liability insurance contracts; it does not *require* exhaustion by actual payment in the absence of policy language stating otherwise. Rather, in *Ali*, we looked to the language of the excess policy at issue there and concluded that the contract's exhaustion requirement unambiguously required

15

actual payment of losses.[13] *See id.* Here, the Payment of Loss provision contains no mention of exhaustion by payment at all. Thus, while there may generally be "good reason to require actual payment up to the attachment points" of excess liability policies, *id.* at 94, the terms of Policy 3's Payment of Loss provision include no such requirement. We therefore find this provision ambiguous and, following *Zeig*, decline to adopt a construction that imposes the proposed unstated condition.

### 2. *The Limit of Liability provision is inapplicable.*

The crux of OneBeacon's argument, however, is not the general exhaustion requirement in the Payment of Loss provision but rather the Limit of Liability provision. OneBeacon focuses on the following portion of that provision:

> The limit of the liability stated in the declarations as applicable to "each occurrence" shall be the total limit of [Fireman's Fund's] liability for all damages sustained as the result of any one occurrence, provided, however, *in the event of reduction or **exhaustion** of the applicable aggregate limit or limits of liability under said underlying policy or policies solely by reason of losses paid thereunder on account of occurrences during this policy period, this policy shall in the event of reduction, apply as excess of the reduced limit of liability thereunder.*

App'x at 185 (emphasis added). OneBeacon argues that this language—referring to exhaustion of aggregate limits of liability "solely by reason of losses paid thereunder"—makes express that the underlying policy limits must be fully paid by the underlying insurer for exhaustion to occur. Fireman's Fund retorts that this provision is irrelevant to the present case, a case that does not involve reduction or exhaustion of the aggregate limit of liability through multiple per-occurrence losses.

---

[13] Moreover, as we explain below, we did not resolve whether the exhaustion provision at issue in *Ali* required payments by the underlying insurers, because both the district court order and "the terms of the relevant insurance policies [] described the exhaustion requirement in the passive voice and did not specify which party was obligated to make the requisite payments." *Ali*, 719 F.3d at 92.

Like the district court, we agree with Fireman's Fund that this provision delineates only what happens when the underlying aggregate limit of liability has been reduced or exhausted by previous per-occurrence claims, requiring the excess insurer to start providing coverage at a lower attachment point. As we have explained in the past, a "per occurrence limit refers to the maximum amount an insurer will pay for a claim arising out of a single 'occurrence'" as defined in the policy, whereas "[a]n aggregate limit refers to the maximum amount an insurer will pay, regardless of the number of occurrences" for which the policyholder is liable. *Utica*, 957 F.3d at 340. Upon occurrences that count towards the aggregate limit, that limit may gradually be reduced until a loss—even if below the per-occurrence limit—reaches the underlying policy's aggregate limit of liability. Under Policy 3's Limit of Liability provision, excess coverage would presumably then apply, regardless of whether that individual claim exceeded the $78 million attachment point. This is not the situation we have here, where, as discussed below, ASARCO sought coverage under Policy 3 for total losses far exceeding the $78 million attachment point. The Limit of Liability provision therefore has no bearing on the present dispute.

The Eighth Circuit in *Waste Management of Minnesota, Inc. v. Transcontinental Insurance Co.* reached the same conclusion with respect to a similar provision in an excess policy. 502 F.3d 769, 773 (8th Cir. 2007). There, the court considered whether the policyholder's underlying insurance had been exhausted despite the underlying insurer's insolvency, where the policyholder and other parties had stepped in to cover the amount the insolvent insurer would have been responsible for. *Id.* Rejecting the excess insurer's argument that the underlying insurer's failure itself to pay precluded exhaustion of the underlying policy, the court concluded that a clause similar to Policy 3's Limit of Liability provision "applies when there are multiple covered accidents occurring during the policy period" and that the clause was intended to "ensure[] that

the primary insurer's policy limit would not be deemed exhausted solely by its insolvency, which would impose a form of drop-down liability on the excess insurer." *Id.* at 774. Likewise, in *Polygon Northwest Co. v. American National Fire Insurance Co.*, the Washington Court of Appeals found that similar policy provisions did "not have any bearing" on the issue of whether actual payment by an underlying insurer is a prerequisite to payment on the excess insurance coverage, and "simply mean what they appear to mean—that if the limits of the underlying insurers' policies are reduced by virtue of losses paid, [the excess insurer] nonetheless continues as the excess insurer above those reduced limits."[14] 143 Wash. App. 753, 770–72 (2008).

Nor does *Ali* aid OneBeacon here. As noted above, although in *Ali* we presumed a somewhat similarly worded provision to be applicable, we never held that such a provision requires actual payment by the underlying insurers up to the policy limit. *See* 719 F.3d at 91–92. Instead, we merely affirmed the district court's holding that payment of the underlying losses is a prerequisite to excess coverage, without deciding whether the payment must come from the underlying insurers or whether the losses could be paid by the policyholders themselves. *See id.* at 92; *see also id.* at 92 n.15 (noting reasons why requiring payment of the policy limits by the underlying insurers "would be odd,"

---

[14] In its reply brief, OneBeacon contends that *Polygon* supports its position by distinguishing a case in which the settlement amount was less than the policy limit, and urging that requiring an excess insurer to provide coverage in that circumstance would be inappropriate. *See* Appellant's Reply Br. at 9. But the case *Polygon* referred to was one in which the policyholder and primary insurer settled with an injured plaintiff for less than the policy limit, thus ensuring that the policyholder's losses did not exceed the limit of the primary policy. *See* 143 Wash. App. at 772–73 (citing *Rees v. Viking Ins. Co.*, 77 Wash. App. 716, 718–19 (1995)). The court found that case distinguishable because in *Polygon*, the excess insurer's "obligation to pay was triggered *when Polygon, as the insured, incurred liability* in excess of the limits of [the] underlying policies." *Id.* at 773 (emphasis added). Accordingly, *Polygon* does not support OneBeacon's argument that the underlying insurer's settlement payment to the policyholder—as opposed to the policyholder's liability or losses—must exceed the limit of liability.

including because another insurer's insolvency would effectively relieve excess insurers of their policy obligations); *cf. Trinity Homes LLC v. Ohio Cas. Ins. Co.*, 629 F.3d 653, 658 (7th Cir. 2010) (concluding that similar policy language "is ambiguous and susceptible to the meaning . . . that a [primary] policy can be exhausted when an insured and a [primary] insurer enter into a settlement agreement where the primary insurer will pay a large percentage of the total limit and the insured takes responsibility for the remainder").

Accordingly, the Limit of Liability provision does not impose an unambiguous requirement that the underlying insurance be exhausted by actual payment by the underlying insurer before Policy 3 will apply.

3. *Fireman's Fund is not judicially estopped from arguing that the exhaustion provision is ambiguous.*

OneBeacon next contends that the doctrine of judicial estoppel precludes Fireman's Fund from making the argument it advances on appeal. We are not persuaded.

The doctrine of judicial estoppel "generally prevents a party from prevailing in one phase of a case on an argument and then relying on a contradictory argument to prevail in another phase." *New Hampshire v. Maine*, 532 U.S. 742, 749 (2001) (quoting *Pegram v. Herdrich*, 530 U.S. 211, 227 n.8 (2000)). The Supreme Court has outlined "several factors [that] typically inform the decision whether to apply the doctrine in a particular case," including whether "a party's later position [is] clearly inconsistent with its earlier position" and whether "the party has succeeded in persuading a court to accept that party's earlier position." *Id.* at 750 (internal quotation marks omitted).

Here, OneBeacon has failed to show that Fireman's Fund took a "clearly inconsistent" position in other litigation. *Id.* OneBeacon identifies several other cases

where, it contends, Fireman's Fund argued that the exhaustion provision in its excess policy unambiguously required payment by lower-level insurers, and thus an insurer's insolvency did not obligate Fireman's Fund to provide coverage. The above discussion, however, helps illustrate the flaw in OneBeacon's argument: Although Fireman's Fund has maintained in other litigation that similar excess policies do not require it to "drop down" and effectively reduce its policy's attachment point to provide coverage in place of an insolvent underlying insurer, Fireman's Fund has not argued in those cases that it has no obligation to provide coverage for losses to the policyholder *in excess of* the underlying limit of liability simply because the underlying insurer did not pay the entire amount it owed. By conflating these two positions, OneBeacon conjures up a contradiction where there is none.

To explain, we briefly recount the facts of *First State Insurance Co. v. American Home Assurance Co.*, the case in which, according to OneBeacon, Fireman's Fund successfully made an argument contradictory to the one it now advances. 463 F. Supp. 3d 298 (D. Conn. 2020). In that case, Fireman's Fund provided an excess liability insurance policy to an asbestos company, Familian. The Fireman's Fund excess policy applied above two excess policies separately provided by other insurers, First State and Comstock. *Id.* at 303. Comstock, which provided the excess policy immediately below Fireman's Fund's, became insolvent and unable to provide coverage. *Id.* at 303–04. During the litigation, which sought to identify the obligations of the remaining solvent insurers, Fireman's Fund argued that its "excess policy . . . applie[d] only after all the underlying insurance is properly exhausted by the payment of judgments or settlements." *Id.* at 314.

At first glance this assertion may appear in tension with its position here, but Fireman's Fund was not in fact arguing that exhaustion required payment of the full limit of the underlying policy *by Comstock* for its excess policy ever to attach. Instead,

Fireman's Fund affirmatively argued that "once the covered costs and damages allocated to the [relevant] policy year are enough to exhaust the underlying insurance, including the underlying Comstock policy limit, then the [Fireman's Fund] Policy will apply and attach as if the Comstock policy were exhausted." *Id.* at 316. In other words, so long as the covered losses to the policyholder exceeded the Comstock policy limit, Fireman's Fund conceded that it was obligated to provide coverage for losses *beyond* that amount; it disputed only its liability for the gap in coverage *below* the policy limit left by the insolvent Comstock.

Fireman's Fund's position in *First State* and in the other cases flagged by OneBeacon as contradictory are in fact consistent with its proposed interpretation of Policy 3, as those cases involve the separate issue of an excess insurer's obligation to "drop down" to cover gaps in insurance coverage below the attachment point of the excess policy. *Northmeadow Tennis Club, Inc. v. Ne. Fire Ins. Co. of Pennsylvania*, 26 Mass. App. Ct. 329, 330, 334 (1988) (considering whether Fireman's Fund must "'drop down,' i.e., provide coverage for the insured beginning with the first dollar of the insured's liability," and concluding that it was not required to do so, because its policy "presupposes primary insurance being in force and that if it is not in force, the insured is responsible for the lower levels of damage, as if it were a self-insurer"); *see also Hendrix v. Fireman's Fund Ins. Co.*, 823 S.W.2d 937, 939–41 (Ky. Ct. App. 1991) (agreeing with Fireman's Fund that it is not obligated to drop down to fill the gap left by insolvent primary insurer); *Alabama Ins. Guar. Ass'n v. Kinder-Care, Inc.*, 551 So. 2d 286, 288–89 (Ala. 1989) (same). Here, Fireman's Fund does not contend that it was liable under Policy 3 to cover ASARCO's insured losses below $78 million. Instead, it effectively argues that ASARCO, by settling each policy with Fireman's Fund for an amount less than the company's losses, took responsibility for the gap between the below-limits settlement and the policy limits of Policies 1 and 2, with coverage triggered

21

under Policy 3 only because ASARCO's covered losses exceeded the policy's $78 million attachment point.

### 4. North River *does not require a contrary result.*

OneBeacon further resists this interpretation of the exhaustion requirement by pointing to our discussion of settlement allocations in *North River Insurance Co. v. Ace American Reinsurance Co.*, 361 F.3d 134. It asserts that under *North River*, Fireman's Fund was required to allocate its payments entirely to Policies 1 and 2, in line with the "rising bathtub" allocation method employed in that case. Appellant's Br. at 28.

As the district court explained, *North River* (1) did not interpret an exhaustion requirement; and (2) involved a settlement agreement that (a) unambiguously required the losses to be allocated to the lowest layer of insurance first,[15] and (b) included an explicit provision that the amount of the loss to the policyholder was less than the attachment point of the higher policies. *See Fireman's Fund*, 495 F. Supp. 3d. at 309–10; *North River*, 361 F.3d at 141–42. Because the question posed in *North River* was whether the parties were *permitted* to allocate the settlement entirely to the lowest layer of insurance—not whether they were *required* to do so—the case is irrelevant to how the exhaustion requirement should be interpreted in this case.

\* \* \*

---

[15] As we explained, the settlement at issue in *North River* was negotiated under the Wellington Agreement, "an accord reached between a group of insureds, facing thousands of asbestos-product claims, and their insurers." 361 F.3d at 137 n.4. The Wellington Agreement "call[ed] for asbestos payments to be allocated on the basis of horizontal exhaustion, which means losses are allocated to the lowest layer of coverage first." *Id.* at 138 n.6.

We therefore agree with Fireman's Fund's interpretation of Policy 3. The policy does not unambiguously require payment in full by the underlying insurer for the underlying insurance to be exhausted and the policy to attach.

B. *Fireman's Fund's below-limits settlement of ASARCO's claims exhausted Policies 1 and 2, and its allocation of the settlement was therefore within the scope of Policy 3*

Having so interpreted Policy 3's exhaustion requirement, we conclude that Fireman's Fund's below-limits settlement sufficed to exhaust Policies 1 and 2.[16] The settlement released all of the ASARCO Trust's claims under the three policies and Fireman's Fund put forth sufficient evidence that a portion of ASARCO's losses fell within the scope of Policy 3.

Of course, the unique context of Fireman's Fund's settlement with ASARCO makes it harder to pin down ASARCO's losses with certainty. Because ASARCO established a section 524(g) trust for present and future asbestos claimants, *see* 11 U.S.C. § 524(g)(1)–(2), and was seeking to have insurers pay into that Trust, ASARCO had not yet become liable for a fixed amount through judgments for, or settlements with, injured parties when the allocation was conducted. ASARCO had, however, already paid or become obligated to pay $142 million for past claims and reasonably estimated its total liability for past and future claims to range from $400 million to $2.1 billion. The

---

[16] We note that OneBeacon does not argue that underlying insurance policies provided by other insurers, such as those providing coverage between the $53 million upper limit of Policy 2 and the $78 million lower limit of Policy 3, are not exhausted. Additionally, we observe that there seems to be no reason that Policy 1—which covers a different policy year than Policy 3—must be exhausted before Policy 3 would apply. To be sure, how ASARCO's losses are allocated to different policy years could be relevant to whether its losses reach Policy 3's attachment point for the 1983–1984 policy year, but it is unclear why Policy 1 would be implicated by Policy 3's exhaustion requirement, even if we accepted OneBeacon's interpretation of the contract. But because it does not affect our decision, we assume that both Policy 1 and Policy 2 are underlying insurance to Policy 3 and are therefore subject to the exhaustion requirement.

confirmed reorganization plan provided that $915.8 million would be paid by ASARCO's parent company into the ASARCO Trust to cover such claims. ASARCO maintained that its losses would leave all three policies completely exposed, and even Fireman's Fund concluded (albeit internally) that there was a significant probability that Policy 3 would have to be fully paid out. OneBeacon, for its part, offers no argument regarding the proper measure of ASARCO's losses.

Contrary to OneBeacon's argument drawn from our comments in *North River*, we do not think our conclusion runs afoul of our caution against conflating "loss" and "risk of loss." 361 F.3d at 142. The settlement in *North River*—unlike the settlement here—included an agreement as to the amount of the policyholder's covered loss. *Id.* at 141–43. And we don't understand *North River* to hold that *any* below-limits settlement between a policyholder and insurer fixes the policyholder's covered loss at that amount. Such a rule would automatically preclude a policyholder that settles with a lower-level insurer from recovering anything from a higher-level insurer, effectively imposing a stringent exhaustion requirement regardless of the policy language, a result that is in tension with the principle articulated in *Zeig*. We therefore may look to other evidence in the summary judgment record to establish that Fireman's Fund's settlement of ASARCO's claimed losses was not "clearly beyond the scope" of Policy 3. *Id.* at 140.

In these circumstances, we conclude that Fireman's Fund has adequately shown that its settlement for ASARCO's loss was "at least arguably within the scope of the insurance coverage that was reinsured" by OneBeacon. *Utica*, 957 F.3d at 348 (internal quotation marks omitted) (quoting *Mentor Ins. Co.*, 996 F.2d at 517). Because OneBeacon does not otherwise argue that Fireman's Fund's allocation decision was unreasonable or in bad faith, it is therefore bound by the policy's follow-the-settlements clause. *See id.* at 341; *North River*, 361 F.3d at 141.

## II.     The Reinsurance Policy

OneBeacon separately argues that the terms of the reinsurance policy require the full payment of the underlying limits of liability by the underlying insurers before reinsurance coverage attaches. Although we agree with OneBeacon that the district court's order did not explicitly address this argument,[17] we conclude now that it lacks merit.

In support of its argument that the policy "provide[s] that there is no coverage . . . for any loss under $78 million," Appellant's Br. at 50, OneBeacon points to the coverage obligations set forth in the reinsurance policy. As set forth above, these provide that the "reinsurance accepted" is "$3,000,000 [part of] $20,000,000 excess of $75,000,000 excess of underlying [$3 million self-insured retention]." App'x at 198. Fireman's Fund counters that this provision means that the reinsurance policy attaches upon $78 million in losses to ASARCO, not to Fireman's Fund or to other underlying insurers. Accordingly, reminiscent of the exhaustion issue, the question here is whether the reinsurance policy applies once the policyholder's covered losses exceed $78 million, or only once the underlying insurers have paid in excess of $75 million (on top of the $3 million self-insured retention).

After consideration, we agree with Fireman's Fund that the reinsurance policy's attachment point is not contingent upon payment by the underlying insurers. The stated coverage obligations do not define the $75 million figure in terms of payments by insurers under their policies, nor do they refer to any type of exhaustion requirement. We are reluctant to infer from such imprecise language an intent to engraft an unstated condition beyond those expressly included in Policy 3 that would drastically limit the

---

[17] The district court treated this argument as subsumed within the exhaustion question, and therefore did not address it directly. *See Fireman's Fund*, 495 F. Supp. 3d at 302.

reinsurer's coverage obligations. In so concluding, we again find *Zeig*'s reasoning persuasive: The parties could have agreed to reinsurance coverage that was far narrower in scope than the excess policy itself, but we find no suggestion in the text of the reinsurance contract that they intended to do so here.

The cases relied upon by OneBeacon in support of its position are inapposite. They consider whether a reinsurer is obligated to provide coverage when the cedent covers the policyholder's losses below the attachment point of the reinsurance policy, or when the cedent provides coverage in an amount greater than the upper limit of the reinsurance policy, neither of which occurred here. *See Calvert Fire Ins. Co. v. Yosemite Ins. Co.*, 573 F. Supp. 27, 28–29 (E.D.N.C. 1983) (finding reinsurer not liable where the cedent covered all of the policyholder's losses, which were less than the attachment point of the reinsurance policy); *Bellefonte Reinsurance Co. v. Aetna Cas. & Sur. Co.*, 903 F.2d 910, 912 (2d Cir. 1990) ("The sole issue presented on this appeal is whether the reinsurers are obligated to [the cedent] for an amount greater than the amounts stated in the reinsurance certificates."), *overruled by Glob. Reinsurance Corp. of Am. v. Century Indem. Co.*, 22 F.4th 83 (2d Cir. 2021); *Unigard Sec. Ins. Co. v. N. River Ins. Co.*, 4 F.3d 1049, 1071 (2d Cir. 1993) (reaffirming *Bellefonte*), *overruled by Glob. Reinsurance Corp.*, 22 F.4th 83; *Allendale Mut. Ins. Co. v. Excess Ins. Co.*, 992 F. Supp. 271, 277 (S.D.N.Y. 1997) (following *Bellefonte* and *Unigard*).

Because Fireman's Fund has adequately supported its position that ASARCO's covered losses exceeded the attachment point of the reinsurance policy, we conclude that the portion of the settlement allocated to Policy 3 is covered by the reinsurance policy.

## CONCLUSION

For the foregoing reasons, we **AFFIRM** the judgment of the district court.